UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALICE SULLIVAN, | CASE NO. 1:22-CV-00779-CAB |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff Alice Sullivan challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB), supplemental security income (SSI), and disabled widow's benefits (DWB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 13, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document of May 13, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Sullivan filed for DIB and DWB on October 21, 2019, and for SSI on October 22, 2019, alleging a disability onset date of September 8, 2019. (Tr. 78, 87, 96). Her claims were denied initially and on reconsideration. (Tr. 79-86, 88-95, 97-104, 106-12, 114-20, 122-28). She then requested a hearing before an Administrative Law Judge. (Tr. 164-67). On March 31, 2021,

Ms. Sullivan (represented by counsel), and a vocational expert (VE) testified before the ALJ. (Tr. 36-77). On May 5, 2021, the ALJ determined Ms. Sullivan was not disabled. (Tr. 14-35). March 22, 2022, the Appeals Council denied Ms. Sullivan's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Sullivan timely filed this action on May 13, 2022. (ECF #1).

FACTUAL BACKGROUND

## I. Personal and Vocational Evidence

Ms. Sullivan was 57 years old on her alleged onset date, and 59 years old at the administrative hearing. (Tr. 79, 45). She completed 11th grade. (Tr. 45). She was previously employed as a retail store manager, manager at a fast-food restaurant, and in laundry services as a bulk folder and then router. (Tr. 46-47, 49, 51).

## II. Administrative Hearing

At the outset of the hearing, Ms. Sullivan's counsel briefly summarized medical issues, including complex regional pain syndrome post-surgery, for which injections were not helpful, and shoulder and knee issues. (Tr. 43). Ms. Sullivan testified she lives with two of her children, ages 22 and 8. (Tr. 44). She cannot work because she must constantly alternate between sitting and standing due to her knees and left foot. (Tr. 58). She has received physical therapy and injections. (*Id.*). She has swelling and bone spurs in her feet. (Tr. 59). Orthotics help her foot for a while, but it then swells and throbs. (*Id.*).

Ms. Sullivan reported recently falling twice. (Tr. 61). Once, she fell in the middle of the night; her daughter had to help her stand. (*Id.*). She has difficulty bending her left foot and knee, which makes walking difficult. (Tr. 65). She is afraid of falling because she is unable to stand on

2

her own. (*Id.*). To relieve swelling, she uses ice and elevates her foot, but can only sit with her foot propped up for so long before her knees "lock up." (Tr. 65-66). Ms. Sullivan estimates she can stand for ten to fifteen minutes before needing to sit down. (*Id.*). When standing, Ms. Sullivan shifts the weight off her left foot as much as possible. (*Id.*).

Ms. Sullivan also has stiffness and pain in her left shoulder. (*Id.*). She cannot lift her left arm above the shoulder, experiences pain radiating down to her hand, and fears dropping things. (Tr. 67). Both knees were replaced with no improvement. (Tr. 68).

Although Ms. Sullivan can perform some housework, it takes all day because she must constantly alternate between sitting and standing. (Tr. 61). She does not do yardwork or scrub floors but can mop. (Tr. 62). Her daughters help with the housework. (*Id.*). She does not do the grocery shopping but sometimes picks up a few things at the store. (Tr. 61).

On a typical day, Ms. Sullivan is up at 7:00 a.m. to awaken her daughter for school. (Tr. 62). She drives her daughter to the bus stop (which is ten houses down the street) because she cannot walk that far. (*Id.*). While her daughter is at school, she does what she can around the house. (Tr. 63). After she picks her daughter up after school, she helps with homework and reads a book with her. (Tr. 63). Ms. Sullivan's older daughter takes the younger daughter to the zoo or to the lake because Ms. Sullivan cannot. (Tr. 63).

The VE identified Ms. Sullivan's past relevant work as follows: (1) garment folder, DOT #789.687-066, SVP 2, light exertion; (2) warehouse worker, DOT #922.687-058, SVP 2, medium exertion as generally performed, medium-to-heavy as actually performed; (3) fast-food worker, DOT #311.472-010, SVP 2, light exertion as generally performed, heavy as actually performed; and (4)

3

retail store manager, DOT #185.167-046, SVP 7, light as generally performed, heavy as actually performed. (Tr. 70-73).

The ALJ asked the VE if a hypothetical individual of Ms. Sullivan's age, education, and work experience could perform her past relevant work if limited to light work with the following restrictions: can frequently push/pull with the left lower extremity; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; and can frequently be exposed to hazards such as unprotected heights and dangerous machinery. (Tr. 73). The VE determined such an induvial could perform as a garment sorter, as generally and as Ms. Sullivan actually performed it; a fast-food worker, as generally, but not as actually performed; and retail manager, as generally, but not as actually performed. (Tr. 74). If the hypothetical individual were limited to sedentary exertion under those same restrictions, she would be unable to perform Ms. Sullivan's past relevant work. (Tr. 75). If the hypothetical individual could sit for eight hours with standard breaks, stand and walk for ten minutes per hour, occasionally lift up to ten pounds, and must avoid ladders and heights, the individual would not be able to perform Ms. Sullivan's past relevant work. (Tr. 75).

### III.    Medical Evidence[1]

In February 2018, Ms. Sullivan underwent a total knee arthroplasty for end-stage bone-on-bone tricompartmental osteoarthritis with proximal tibial varus. (Tr. 339). Post-surgical physical therapy notes indicate Ms. Sullivan's right knee was replaced in 2013. (Tr. 342). On February 21, 2018, two days after surgery, Ms. Sullivan attended her first physical therapy session. (Tr. 342). She

---

[1]    My summary of the evidence focuses on those portions of the record the parties cite in their briefs that directly relate to Ms. Sullivan's conditions as of the alleged onset date and deemed relevant to the assertions of error.

arrived using a wheeled walker, and "demonstrated decreased stance time on her involved [left] lower extremity" and an antalgic gait. (*Id.*). She reported complying with her post-operative exercise program. (*Id.*). Ms. Sullivan rated her typical pain at 3-4 on a 10-point scale but rated her current pain at 9/10 due to walking. (*Id.*). Ms. Sullivan required the use of a stool to get onto the examination table and needed assistance to lift her leg. (*Id.*). She could not use the recumbent bicycle because of the decreased range of motion in the "uninvolved [right] lower extremity." (Tr. 343). She used the upright bicycle with her left leg while propping the right leg on a chair. (*Id.*).

On February 23, 2018, Ms. Sullivan arrived at her second PT session on bilateral crutches. (Tr. 346). Her gait, strength, range of motion, and swelling were all improved. (*Id.*). She endorsed 9/10 pain due to "really pushing it" during her home exercise program (HEP). (*Id.*). During the third session, on February 26, Ms. Sullivan reported 7/10 pain with increased pain at night. (Tr. 348). Using bilateral crutches, Ms. Sullivan ambulated with a moderately guarded or antalgic gait and her knee was hypersensitive to light touch. (*Id.*). On March 1, 2018, Ms. Sullivan reported pain with bending her knee. (Tr. 350). The therapist noted mild bruising and ecchymosis and limited knee flexion secondary to pain. (*Id.*).

On March 6, 2018, Ms. Sullivan met with her surgeon, Albert Dunn, D.O., for a follow-up appointment. (Tr. 354). Ms. Sullivan reported doing well despite a bout of sickness over the weekend. (*Id.*). Physical examination revealed moderate post-operative swelling and nearly full extension of the left knee. (*Id.*). A left-knee x-ray revealed a well-positioned knee without sign of fracture, subsidence, or loosening of hardware. (*Id.*). Dr. Dunn transitioned Ms. Sullivan off Celebrex, re-prescribed meloxicam twice daily, and added prednisone for swelling. (Tr. 355). Dr. Dunn noted Ms. Sullivan's significant history of arthrofibrosis in the right knee. (*Id.*).

That same day, Ms. Sullivan arrived at her fifth PT session using only one crutch. (Tr. 352). She displayed a guarded, antalgic gait, decreased knee extension, and decreased stance time on the left. (*Id.*). She tolerated the exercises well and did not report increased pain with exercises. (*Id.*). On March 8, 2018, Ms. Sullivan complained of continued soreness. (Tr. 358). She showed improved range of motion in the left knee and tolerated her PT exercises without increased pain. (*Id.*).

On March 15, Ms. Sullivan reported her knee was very stiff and said the medication was not helping with her pain. (Tr. 360). She tolerated the session without increased pain. (*Id.*). The therapist noted an antalgic, guarded gait and a lack of knee extension with ambulation. (*Id.*). On March 21, Ms. Sullivan expressed frustration with the continued stiffness and pain. (Tr. 362). She was complying with her HEP, but reported feeling fatigued easily and complained of morning stiffness in her calf and hamstring. (*Id.*). On March 23, Ms. Sullivan reported doing well overall and showed improvement with knee range of motion. (Tr. 364). The therapist noted increased muscle tightness in the legs and improved gait. (*Id.*). On March 28, Ms. Sullivan reported stiffness and pain in both knees and felt she was not walking correctly. (Tr. 366). She reported soreness after the session. (*Id.*). On March 30, Ms. Sullivan reported increased swelling in her left knee and leg with painful, end-range flexion. (Tr. 368). The therapist advised Ms. Sullivan to elevate her leg at night and use ice to decrease the pain and swelling. (*Id.*).

On April 2, 2018, Ms. Sullivan reported doing much better and rated her pain at 2/10. (Tr. 370). She endorsed being able to navigate steps one stair at a time and expressed concern about a sore spot on her tibia. (*Id.*). She showed an improved gait pattern but was limited by the right knee. (*Id.*). On April 3, she met with Dr. Dunn and reported doing well and endorsed

improved range of motion and some knee soreness. (Tr. 372). Physical examination and x-rays were unremarkable. (*Id.*).

On April 8, 2018, Ms. Sullivan returned to PT and reported difficulty bending the left knee, endorsed decreased strength, endurance, and ability to stand for more than a half-hour, and rated her pain at 6/10. (Tr. 374). The therapist observed a guarded, antalgic gait with decreased knee extension. (*Id.*). Ms. Sullivan tolerated the session without reporting increased pain. (*Id.*). The therapist noted Ms. Sullivan was challenged with range of motion and fatigued easily. (*Id.*). On April 10, Ms. Sullivan reported being very sore after the last session. (Tr. 376). She reported soreness and fatigue following her exercises. (*Id.*). On April 17, Ms. Sullivan reported soreness in her left hip and knee. (Tr. 378). The therapist observed she was limited by increased pain and was more sensitive in the right knee. (*Id.*).

In August 2018, Ms. Sullivan met with podiatric physician Jonathan Sharpe, D.P.M., to discuss severe and throbbing left lateral foot pain that began after her left knee replacement. (Tr. 703). He noted "musculoskeletal pain with motion to 4th and 5th rays, focal severe pain near the mid to base of the 4th metatarsal left," and assessed Ms. Sullivan with a closed, nondisplaced fracture of the identified bone. (Tr. 703). In-office x-rays revealed "periosteal reaction lateral diaphysis of the 4th metatarsal." (Tr. 704). Dr. Sharpe prescribed a pneumatic walking boot to immobilize the foot, instructed Ms. Sullivan to wear it when ambulating, and scheduled her to return in four weeks with updated x-rays. (Tr. 703-04).

Ms. Sullivan returned to Dr. Sharpe's office on September 10, 2018. (Tr. 701). She reported some pain at night and endorsed being pain-free with immobilization in the boot. (*Id.*). She also reported "a lot of pain" and a pulling sensation when trying to turn her foot inward. (*Id.*).

Physical examination revealed pain with motion to the 4th and 5th toes and focal severe pain near the mid to base of the 4th metatarsal, no detectable Lisfranc instability, "very painful" forced eversion and dorsiflexion of the tarsometatarsal joints, and intact extensors. (*Id.*). In-office x-rays showed "solid periosteal reaction lateral diaphysis of the 4th metatarsal" and "possible geographic lesion base medial 2nd metatarsal with erosive appearance to the medial cortex and narrowing and sclerosis of the medullary canal." (Tr. 702). Because Ms. Sullivan had prolonged symptoms not improved with immobilization, Dr. Sharpe ordered an MRI. (Tr. 701).

On September 20, 2018, Ms. Sullivan returned to Dr. Sharpe's office to discuss the MRI. (Tr. 698). She reported no change in her symptoms and endorsed reduced pain while wearing the walking boot. (*Id.*). The MRI revealed mild marrow edema along the lateral margin of the cuboid bone and minimal marrow edema of the dorsal margin of the lateral cuneiform bone about the third tarsometatarsal articulation, findings that "may reflect component of mild stress reaction," and sesamoiditis of the tibial and fibular sesamoid bones at the first metatarsophalangeal joint with an equivocal, longitudinally oriented fracture through the distal margin of the tibial sesamoid bone. (Tr. 699). Dr. Sharpe offered continued immobilization treatment in a pneumatic boot or a hard cast or offloading pressure with crutches. (Tr. 698). Ms. Sullivan opted to use the boot and was instructed to follow up in three weeks. (*Id.*).

Ms. Sullivan returned on October 11, 2018, and reported her foot was still painful and bruising. (Tr. 696). On physical examination, Dr. Sharpe noted "maximal pain dorsal midfoot near base of 3/4 metatarsals left." (*Id.*). In-office x-rays revealed "heel spur, cortical thickening lateral cortex 4th metatarsal," without other overt fracture, advanced degenerative disease, or

8

misalignment." (Tr. 697). Dr. Sharpe found she had a closed fracture of the sesamoid bone, for which he prescribed a cast and crutches "to completely rest the foot." (Tr. 696).

Ms. Sullivan returned to Dr. Sharpe on November 12, 2018. (Tr. 694). She complained of some lateral pain but doing okay. (*Id.*). She reported wearing tennis shoes the last three days but limited her walking because she continued to have twinges of pain with ambulation. (*Id.*). Dr. Sharpe noted no overt antalgic gait and no edema. (*Id.*). Dr. Sharpe ordered a bone scan and determined Ms. Sullivan could return to work but must wear a boot for a week. (*Id.*).

On December 10, 2018, Ms. Sullivan returned to Dr. Sharpe's office to discuss the results of the bone scan. (Tr. 691). Ms. Sullivan was ambulatory in a cast boot and reported no foot pain without the boot but pain with periods of walking. (*Id.* at 691-92). The bone scan revealed asymmetric flow with greater activity on the right lower extremity than on the left, though the interpreting physician was unable to determine if the right lower extremity flow was increased on the right or decreased on the left. (Tr. 692). Otherwise, the bone scan showed increased activity in the soft tissues of the right foot and "focal increased activity" within the "left midfoot at the level of the lateral aspect, approximately at the cuboid or third cuneiform level," and "focal increased activity of what appears to be the second tarsometatarsal articulation of the left foot." (Tr. 691-92). Dr. Sharpe concluded the bone fracture was healed, but that Ms. Sullivan had developed degenerative joint disease in her left foot. (Tr. 692). He instructed her to transition slowly out of the boot into a supportive shoe. (*Id.*). Dr. Sharpe offered Ms. Sullivan a cortisone injection if the osteoarthritis in her foot became symptomatic. (*Id.*).

On April 25, 2019, Ms. Sullivan returned to Dr. Sharpe's office with pain in the left midfoot, worse with pressure to the lateral aspect. (Tr. 689). Dr. Sharpe noted Ms. Sullivan was full

9

weight-bearing and walking in tennis shoes. (*Id.*). Physical examination revealed very sharp pain with "abductor E stress through the Lisfranc joint," at about the third tarsometatarsal joint over towards the cuboid, and some tenderness with direct palpation. (*Id.*). Additionally, Ms. Sullivan had pain to palpation along the medial cuboid bone. (*Id.*). The lateral collateral ligaments and peroneal muscles seemed to be functioning well without signs of issue in the area. (*Id.*). Dr. Sharpe noted multiple conservative treatment modalities had failed to provide adequate relief and recommended a CT scan "for possible surgical planning." (*Id.*).

On May 6, 2019, Ms. Sullivan, still ambulatory in good tennis shoes, returned to Dr. Sharpe's office. (Tr. 865, 867). The CT scan showed chronic thickened plantar fascia with sequela of chronic fasciitis. (Tr. 686). Of the treatment options offered, including "stretching, oral anti-inflammatories or steroids, cortisone injections, formal physical therapy, immobilization, or ultimately surgical intervention," Ms. Sullivan opted for immobilization in a boot. (Tr. 867). Dr. Sharpe gave her a night split, ordered her to wear the boot, and prescribed meloxicam. (*Id.*).

On August 26, 2019, Ms. Sullivan returned to Dr. Sharpe and reported the night splint did not help. (Tr. 683). She stated her foot felt like it was on fire, with pain across the toes and lateral foot, and radiating up her leg. (*Id.*). She reported the foot pain starts first thing in the morning and the burning sensation begins at about 11:00 a.m. (*Id.*). Physical examination revealed tenderness to palpation at the left plantar fascia enthesis and diffusely across the left fifth metatarsal, pain on active resistance of left forefoot eversion, and tenderness to palpation at the peroneus brevis, just distal to the lateral malleolus to its enthesis. (*Id.*). Dr. Sharpe determined the best treatment option was surgical endoscopic plantar fasciotomy (EFP). (Tr. 684).

On September 13, 2019, Dr. Sharpe performed the EFP. (Tr. 399). On September 16, during a follow-up phone call with the surgical center, Ms. Sullivan rated her pain at 2/10 and indicated Motrin was controlling her pain. (Tr. 401). On October 21, Ms. Sullivan returned to Dr. Sharpe's office with continued complaints of daily left foot pain, rated 8/10. (Tr. 677). She reported having no pain at rest but pain with weightbearing, and ambulated of her own accord. (*Id.*). Physical examination revealed a well-healed surgical incision, no pain with palpation to the inferior calcaneus or the fascia origin, but a recurrence of dorsal lateral foot pain and sharp, focal pain at the base of the fourth metatarsal. (*Id.*). The area was very tender to touch. (*Id.*). Ms. Sullivan deferred a cortisone injection. (*Id.*). Dr. Sharpe ordered a bone scan to search for fractures. (*Id.*).

On October 28, 2019, Ms. Sullivan met with Dr. Sharped to review the results of her bone scan that revealed the following:

> 1.     In the left foot and ankle, there is increased radiotracer uptake in all three phases. On the delayed phase, there is diffusely increased juxta-articular radiotracer uptake in the left ankle joints and at the left great toe metatarsophalangeal joint, as well as the calcaneus. Findings could indicate complex regional pain syndrome/reflex sympathetic dystrophy [syndrome (CRPS/RSDS)]. Please correlate for appropriate clinical symptoms.
>
> 2.     Interestingly, in the asymptomatic right foot, there is also increased radiotracer uptake in the right ankle and great toe metatarsophalangeal joint in a similar pattern as the left. This could also indicate underlying reflex sympathetic dystrophy in the correct clinical setting.

(Tr. 674). Ms. Sullivan endorsed the same symptoms and reported taking Motrin daily for pain. (Tr. 673). Dr. Sharpe noted Ms. Sullivan had complained of pain for fourteen months and failed extensive conservative care, including boots, casts, physical therapy, various medications, and EPF surgery. (Tr. 675). Based on the bone scan, Dr. Sharpe expressed concern for RSD. (*Id.*). Despite seeming "a little atypical for CRPS or RSD," Dr. Sharpe determined it "certainly is not out of the

realm of possibility," and concluded Ms. Sullivan needed to be evaluated for the condition. (*Id.*).

Dr. Sharpe noted treatment options for the condition include formal physical therapy and nerve

blocks. (*Id.*). He prescribed physical therapy and referred Ms. Sullivan to a pain management

physician for consultation on nerve blocks. (*Id.*).

Ms. Sullivan met with the pain management physician, Adam Hedaya, M.D., on November

4, 2019. (Tr. 393). Dr. Hedaya's treatment note indicates Dr. Sharpe suspected RSD from previous

plantar fasciitis. (Tr. 396). Ms. Sullivan described the pain as severe and constant and stated it hurt

to walk, and they discussed injections. (*Id.*). Dr. Hedaya assessed plantar fasciitis of the left foot

and CRPS, and offered a left stellate ganglion impar block. (*Id.*).

Another treatment note, dated November 7, 2019, stated: "Dr. Sharpe suspects this may be

[RSD] from previous plantar fasciitis. States pain is severe and constant. It hurts to walk. Discussed

injections. Will proceed with Left lumbar sympathetic block. Discussed nerve testing but has

needle phobia." (Tr. 390). On November 7, Ms. Sullivan received a left stellate ganglion block

injection at the C6 interspace for "causalgia of the left upper limb." (Tr. 392, 599). She did not

receive a lumbar sympathetic block from Dr. Hedaya. I note here that Ms. Sullivan did not begin

to complain of left shoulder and arm pain until October 2020 (see below), suggesting Dr. Hedaya

provided a neck injection instead of the lumbar injection. Ms. Sullivan confirmed this at her next

appointment with Dr. Sharpe on November 12:

> Alice is here today following up after her visit with Dr. Hedaya for RSD treatment.
> She states she was supposed to get an injection in L4 on 11-7-19, to which she signed
> a consent, but when she woke up there was a band aid on her neck. When she
> inquired to why it was given in the neck she was told that was the plan. She states
> that was not the plan, and when she looked at the consent she signed, the L4 was
> crossed out. She had a follow up on Friday and Dr. Hedaya wanted to x-ray her back
> to which she refused because she could not get a clear explanation as to why the
> injection was given in the neck. She does not plan to return to him for care.

(Tr. 669).

Dr. Sharpe's treatment note indicated there were no changes or improvement in the left foot, and he noted Ms. Sullivan continued to complain of chronic pain. (Tr. 671). Dr. Sharpe reviewed the bone scan again and determined Ms. Sullivan's condition was most consistent with RSD, a chronic condition. (*Id.*). Dr. Sharpe stressed the importance of pain management for RSD and referred her to a new pain management physician. (*Id.*). On November 26, Dr. Sharpe added an addendum to the treatment note, stating:

> I do not expect Alice to return to employment. She now has a serious diagnosis that most often leads to disability secondary to chronic unremitting pain. I have advised her to seek disability. She has a chronic pain condition that even makes sedentary and light duty difficult secondary to the level of unrelenting pain. I am not recommending any work. Her left foot needs to be the priority so that we may hopefully preserve some quality of life for her.

(*Id.*).

On November 19, 2019, Ms. Sullivan met with pain management physician Dean C. Pahr, D.O., to discuss her left foot pain. (Tr. 469). She reported the pain is improved with sitting, over-the-counter medications, and ice, and is aggravated by standing, walking, and activity. (*Id.*). Ms. Sullivan had not fallen in the past year but endorsed difficulty walking, problems with imbalance, and difficulty performing activities of daily living (ADLs). (*Id.*). She rated her current foot pain at 4/10 and endorsed a headache, difficulty swallowing, and joint pain. (Tr. 470). Neurological examination was normal and physical examination revealed lateral foot pain and some pain with deeper palpation on the lateral aspect of the foot, but without discoloration, cold intolerance, allodynia, or hypersensitivity. (*Id.*). Dr. Pahr concluded Ms. Sullivan had CRPS I of the left lower extremity. (*Id.*). Dr. Pahr ordered a left diagnostic sympathetic block to differentiate her pain and

13

noted "if this helps her pain this is diagnostic for the complex regional pain syndrome," and he "would need to continue to help her overcome this pain." (*Id.*).

On December 13, 2019, Ms. Sullivan underwent a left lumbar sympathetic block. (Tr. 422). On December 16, the surgical center called Ms. Sullivan to follow up after the procedure; Ms. Sullivan reported 0/10 pain. (Tr. 423).

On January 15, 2020, Ms. Sullivan returned to Dr. Pahr's office for a follow-up appointment. (Tr. 466). She denied pain relief from the injection, endorsed difficulty walking at times due to foot pain, and rated her pain at 8.5/10. (*Id.*). In light of the lumbar injection's failure to provide relief and the lack of redness, swelling, warmth, allodynia, and hypersensitivity, Dr. Pahr assessed Ms. Sullivan with left foot pain and osteoarthritis of the left knee, prescribed Voltaren gel, and advised Ms. Sullivan to continue to wear the orthotic to help her ambulate better. (Tr. 467).

On February 4, 2020, Ms. Sullivan met with orthopedic doctor Sara Lyn Miniaci-Coxhead, M.D., at the Beachwood Family Health and Surgery Center to discuss her left foot pain. (Tr. 793). Ms. Sullivan reported constant pain on the lateral border of the foot, rated 3/10 at best and 10/10 at worst. (Tr. 794). She described the pain as dull and aching, exacerbated by walking, managing stairs, and prolonged standing, and improved with rest. (*Id.*). Ms. Sullivan stated she can walk five minutes before needing to stop due to pain. (*Id.*). Physical examination of the left foot revealed intact sensation with tenderness to palpation on the lateral border of the foot and at the plantar metatarsal heads. (Tr. 795-96). She had normal range of motion in the foot and ankle. (Tr. 796). In-office x-rays did not reveal any gross abnormalities and Dr. Coxhead interpreted Ms. Sullivan's

14

MRI to show edema on the lateral border of her foot. (Tr. 794). Dr. Coxhead recommended orthotics and physical therapy and provided a metatarsal pad. (*Id.*).

On February 10, 2020, Ms. Sullivan returned to Dr. Sharpe's office with continued left foot pain on the lateral side. (Tr. 667). She reported the injections did not provide relief and endorsed difficulty walking. (*Id.*). She displayed a slightly antalgic gait. (*Id.*). Physical examination revealed "maximal pain with palpation to the mid to distal 5th metatarsal joint," "pain around the 5th metatarsal phalangeal joint," and "pain with plantar palpation" in the same region. (*Id.*). Dr. Sharpe also noted the foot was cool and had some mottling or violaceous discoloration. (*Id.*). Dr. Sharpe ordered an updated MRI and lab testing for further evaluation and released Ms. Sullivan to sedentary or light work, specifying that she may sit eight hours with standard breaks, stand and walk ten minutes per hour, lift ten pounds infrequently, and must avoid climbing ladders and heights. (Tr. 667-68). The MRI revealed degenerative changes within the sesamoids versus mild sesamoiditis and intermetatarsal bursitis involving the first interspace. (Tr. 480).

On February 15, 2020, Ms. Sullivan tripped on her dog and injured her right foot. (Tr. 664-65). X-rays taken the following day showed an acute avulsion fracture of the base of the proximal phalanx of the right great toe medially. (*Id.*).

On February 17, 2020, Ms. Sullivan and Dr. Sharpe discussed the results of her updated MRI. (Tr. 664). Physical examination was unchanged. (Tr. 665). Dr. Sharpe noted "[e]tiology of pain is unclear at this time," discussed symptoms being associated with something nerve-related, ordered an EMG, and referred Ms. Sullivan to a rheumatologist for further evaluation. (Tr. 665). In a final note, Dr. Sharpe stated "[p]ossible nerve etiology. Prior bone scan suggestive of [RSD].

15

No relief with sympathetic nerve blocks." (Tr. 666). The results of the EMG study were all within normal limits. (Tr. 713-14).

In May 2020, a DEXA bone density study of the lumbar spine and bilateral hip revealed normal mineralization of the lumbar spine and osteopenia at the hips. (Tr. 747).

On July 7, 2020, Ms. Sullivan returned to Dr. Coxhead's office and reported physical therapy did not improve her pain, which she described as a constant burning sensation. (Tr. 780). She reported the pain was exacerbated by walking and improved with rest. (*Id.*). Physical examination revealed diffuse pain across the forefoot with palpation and light touch. (Tr. 782). Foot and ankle range of motion were normal. (*Id.*). Dr. Coxhead ordered an MRI of the left foot. (Tr. 780).

On July 27, 2020, Ms. Sullivan followed up with Dr. Coxhead, reporting unchanged pain exacerbated by walking and improved with steroid medication. (Tr. 776-77). Ms. Sullivan stated she could only walk from the first handicap spot to the store before needing to stop due to foot pain. (*Id.*). Dr. Coxhead noted "unclear etiology of her foot pain based on the MRI" and discussed that the pain may be related to overloading the lateral border of her foot after her knee replacement. (Tr. 778). She ordered custom orthotics and prescribed physical therapy with a focus on gait training. (*Id.*).

On July 30, 2020, Ms. Sullivan met with Matthew Testrake, D.P.M., to discuss her left foot pain that she rated 8/10, exacerbated by walking and standing. (Tr. 772-73). Physical examination revealed pain with palpation to the ball of the left foot and lateral aspect of the left fifth metatarsal and mild pain to the left plantar second interspace. (Tr. 775). Dr. Testrake agreed with her past

16

work-up "that some of her pain could be second to adapting to past [knee replacement]. I agree in trying custom orthotics." (Tr. 776).

On October 2, 2020, Ms. Sullivan met with Kristina Vaji, APRN, CNP, reporting an inability to lift her left arm up and complained of anxiety. (Tr. 768). Physical examination of the left shoulder revealed pain at 90 degrees and a positive Phelan's test. (Tr. 770). CNP Vaji referred Ms. Sullivan for psychological and orthopedic consultations and physical therapy and ordered shoulder x-rays. (Tr. 771).

On October 12, 2020, Ms. Sullivan attended a physical therapy evaluation for her shoulder. (Tr. 762). Her chief complaint was left arm pain and limited range of motion. (Tr. 763). She reported intermittent tingling in the left hand and difficulty grasping objects. (*Id.*). She complained of functional limitations including lifting, reaching behind the back, overhead reaching, using her hand with her arm at shoulder level, dressing, gripping, and pulling. (*Id.*). She presented with decreased range of motion and weakness in the left shoulder with flexion, abduction, and internal and external rotation. (*Id.*). Hawkins-Kennedy testing was positive on the left shoulder. (*Id.*). She displayed extreme sensitivity to light touch near the left acromioclavicular joint, bicipital groove, and upper trapezius. (*Id.*). The physical therapist also noted increased spasm throughout the upper trapezius. (*Id.*). Left arm range of motion and strength were diminished. (Tr. 765).

On October 14, 2020, Ms. Sullivan met with Anne M. Rex, D.O., for an orthopedic consultation of her left shoulder. (Tr. 757-58). Ms. Sullivan described pain, rated at 4/10, with no known injury, aggravated by sleeping and raising the arm, and alleviated by nonuse of the arm. (Tr. 758). She also endorsed tingling in her left hand. (*Id.*). Physical examination revealed tenderness to

17

palpation over the acromioclavicular joint, supraspinatus, and upper deltoid region. (Tr. 760). Dr. Rex noted limited forward flexion and an inability to reach up her back at all due to pain. (*Id.*). She had mild pain and weakness with resisted external rotation and supraspinatus testing and could not position her arm for crossarm abduction at all. (*Id.*). Hawkins' testing was positive. (*Id.*). Cervical examination revealed hypertonicity and spasm throughout the lower cervical spine muscles. (*Id.*). The x-ray revealed mild narrowing and spurring at the acromioclavicular joint. (Tr. 761). Dr. Rex assessed impingement syndrome of the left shoulder, rotator cuff syndrome, primary osteoarthritis, and chronic left shoulder pain, and ordered a shoulder MRI and prescribed Mobic. (Tr. 761-62).

On October 16, 2020, Ms. Sullivan attended a second physical therapy session where she reported 6/10 pain, showed good tolerance to the exercises, and did not complain of increased pain after treatment. (Tr. 756). She endorsed difficulty sleeping due to left hand tingling and numbness at night. (*Id.*). At her third physical therapy session on October 19, Ms. Sullivan reported her shoulder hurts if she uses it and does not hurt when she rests it. (Tr. 753-54). Ms. Sullivan did not have increased pain after treatment. (Tr. 754). She complained of continued difficulty sleeping and she cannot sleep on her left side. (*Id.*). On October 23, Ms. Sullivan demonstrated difficulty with active flexion and abduction range of motion. (Tr. 751-52). She tolerated pulleys in flexion and abduction but complained of burning and aching following the exercises. (Tr. 752). Abduction exercises and stretching across the back were attempted but discontinued due to extreme limitation and discomfort. (*Id.*). She reported using her right arm for all tasks due to pain with ADLs. (*Id.*).

On November 2, 2020, Ms. Sullivan reported her shoulder felt heavy and painful after using her arm a lot over the weekend. (Tr. 860). She had decreased pain, 4/10, following US/STM therapy but returned to pre-treatment levels of pain, 8/10, following the exercises. (Tr. 861). On November 5, Ms. Sullivan reported her shoulder felt heavy and tight and she had intermittent numbness and tingling in the last two fingers of her right hand. (Tr. 876). She reported a burning sensation in the left shoulder with all therapy exercises. (*Id.*).

On November 12, 2020, Ms. Sullivan reported that her shoulder was hurting badly that day. (Tr. 883). She stated that driving was becoming difficult because she is having problems turning the wheel with her left arm. (*Id.*). She demonstrated improvement in pain level following the treatment, down to 6/10. (*Id.*). On November 16, Ms. Sullivan was discharged after a final therapy session because low-level exercises were too painful to perform, and she was not progressing. (Tr. 890). She displayed tenderness to the bicipital groove of the left shoulder, was highly sensitive to light touch, and exhibited decreased left upper extremity range of motion. (Tr. 892).

On November 19, 2020, a shoulder MRI revealed mild tendinosis at the supraspinatus and infraspinatus tendons and mild strain with edema-like signals of the supraspinatus and infraspinatus muscles. (Tr. 865). The labrum showed degeneration and fraying without a discrete tear. (Tr. 866). The acromioclavicular joint showed mild to moderate hypertrophic degenerative changes. (*Id.*). Other findings include mild to moderate bursal distention at the subdeltoid/subacromial bursa and reactive subcortical cystic changes at the greater tuberosity of the humerus. (*Id.*).

On November 24, 2020, Ms. Sullivan met with Dr. Rex to discuss the MRI results. (Tr. 908). Ms. Sullivan reported burning pain and Mobic did not help. (*Id.*). Physical examination revealed tenderness to palpation through the trapezius, levator scapula, and base of the neck on the left side along the infraspinatus and supraspinatus. (Tr. 909). Ms. Sullivan had very limited shoulder range of motion and could not reach behind her back past the lateral hip. (*Id.*). She had pain with positioning for crossarm abduction and had a positive Hawkins' test. (*Id.*). Dr. Rex noted the pain was "somewhat out of proportion to MRI findings – therefore, possible adhesive capsulitis with strain into neck," as well as a component of radicular pain into the left shoulder/arm. (Tr. 911). Dr. Rex referred Ms. Sullivan to consult with a pain management specialist. (*Id.*).

Another DEXA bone density scan taken on November 27, 2020, revealed osteopenia in the right hip. (Tr. 918).

On January 12, 2021, Ms. Sullivan saw CNP Vaji. (Tr. 932). She had pain with left shoulder abduction and a positive Phelan's test. (Tr. 933).

## IV.    Medical Opinions

On April 20, 2020, Abraham Mikalov, M.D., a state agency medical consultant, reviewed Ms. Sullivan's medical records and concluded she was not disabled. (Tr. 85-86). Dr. Mikalov determined Ms. Sullivan could lift and/or carry twenty pounds occasionally, ten pounds frequently; stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. (Tr. 83-85). On

November 7, 2020, W. Scott Bolz, M.D., a state agency medical consultant, adopted Dr. Mikalov's opinion. (Tr. 110-11).

In March 2021, Dr. Sharpe completed a Medical Source Statement regarding Ms. Sullivan's foot impairment. (Tr. 970). He prefaced that his assessment was based on his diagnoses of CRPS (code G90.50), pain the left foot (code M79.672), primary osteoarthritis of the left foot and ankle (code M19.072), and plantar fascial fibromatosis (M72.2). (*Id.*). Dr. Sharpe opined Ms. Sullivan can sit for at least six hours and stand/walk for two hours in an eight-hour workday, stand for five to fifteen minutes at a time, and is unable to walk a block at a reasonable pace on rough or uneven surface, to walk enough to shop or bank, or to climb a few steps at a reasonable pace. (*Id.*). In addition, Dr. Sharpe opined Ms. Sullivan suffers from marked pain resulting in serious limitations in her ability to function. (Tr. 971). He commented that Ms. Sullivan was unresponsive to conservative and surgical care, and that the chronic pain is secondary to RSD, a chronic nerve pain condition. (*Id.*).

## V.    Other Relevant Evidence

On January 6, 2020, Ms. Sullivan completed a Disability Report for administrative appeal purposes and stated her foot feels as though she is walking on broken bones. (Tr. 302). She reported that her foot issue is "throwing everything off" and her hips and knees ache horribly. (*Id.*). Her legs start to ache very badly after thirty minutes, and she can no longer stand. (Tr. 307).

On December 11, 2020, Ms. Sullivan completed another Disability Report in which she reported difficulty walking. (Tr. 313). She also stated she could not sit more than ten minutes at a time "due to knees and hips locking up and hurting." (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.   It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3.   The prescribed period ends November 30, 2021.

4.   The claimant has not engaged in substantial gainful activity since September 8, 2019, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

5.   The claimant has the following severe impairments: fractures of the left foot; osteoarthritis of the left foot and bilateral knees; hypothyroidism; and hernia (20 CFR 404.1520(c) and 416.920(c)).

6.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

7.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: frequently push/pull with the left lower extremity; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; frequent exposure to hazards, such as unprotected heights and dangerous machinery.

8.   The claimant is capable of performing past relevant work as a Garment Folder and Retail Store Manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

9.   The claimant has not been under a disability, as defined in the Social Security Act, from September 8, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-29).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

24

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Sullivan takes issue with the ALJ's analysis of Dr. Sharpe's medical opinion and of her own statements about the intensity, persistence, and limiting effects of her symptoms. (*See* Pl.'s Br., ECF #9, PageID 1021). Specifically, in relation to Dr. Sharpe's medical opinion, she asserts the ALJ did not comply with the Social Security Administration's (SSA) regulations when she did not consider the supportability of his opinion and discounted his opinion for a reason that is inconsistent with the issues discussed in Social Security Ruling (SSR) 03-2p. (*Id.* at PageID 1025-26). Ms. Sullivan also claims that when evaluating the intensity, persistence, and limiting effects of her symptoms the ALJ failed to comply with SSR 16-3p and SSR 03-2p. (*Id.* at PageID 1029). The Commissioner responds that the ALJ appropriately analyzed Dr. Sharpe's medical opinion and Ms. Sullivan's symptoms, and her conclusions are supported by substantial evidence. (Comm'r Br., ECF #10, PageID 1043, 1048).

A.      **Evaluating RSDS/CRPS**

SSR 03-2p explains SSA's policies for evaluating disability claims based on RSD/CRPS. SSR 03-2p, 2003 WL 22399117 (Oct. 20, 2003). These terms are synonymous and describe a "chronic pain syndrome most often resulting from trauma to a single extremity," but can also result from diseases, surgery, or injury affecting other parts of the body. *Id.* at *1. According to SSR 03-2p:

> The most common acute clinical manifestations of RSDS/CRPS include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain is out of proportion to the severity of the injury sustained by the individual.

*Id.* Individuals with RSDS/CRPS "typically report persistent, burning, aching or searching pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch." *Id.* at *2. Diagnosing RSDS/CRPS requires the presence of complaints of persistent, intense pain resulting in impaired mobility of the affected region. *Id.* The complaints of pain are associated with (1) swelling; (2) autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh); (3) abnormal hair or nail growth (growth can either be too slow or too fast); (4) osteoporosis; or (5) involuntary movements of the affected region of the initial injury. *Id.* Cases have been reported to progress and spread to other limbs or to remote parts of the body. *Id.*

When documented by appropriate medical signs, symptoms, and lab findings, RSDS/CRPS constitutes a medically determinable impairment at Step Two of the sequential analysis process. *Id.* at *4. For purposes of disability evaluation, the impairment can be established

26

in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the above-described clinically documented signs in the affected region at any time following the documented precipitant. *Id.* "When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment." *Id.*

Importantly, it is the individual's complaints of pain, not the clinically documented signs, that must be persistent. *See id.* ("It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present."). Due to the transitory nature of objective findings, SSR 03-2p instructs adjudicators that "[c]larification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources." *Id.* at *5.

Once the disorder is established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *Id.* at *6. If the adjudicator finds that pain or other symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work activities, a "severe" impairment must be found to exist. *Id.*

Because RSDS/CRPS is not a specifically listed impairment, an individual with the condition alone cannot be found to have an impairment that meets the requirements of a listed

impairment at Step Three of the sequential evaluation. *Id.* However, the specific findings should be compared to any pertinent listing to determine whether medical equivalence exists. *Id.*

When the ALJ determines the individual's impairment does not meet or equal any listed impairment, the ALJ must assess the individual's residual functional capacity (RFC) and proceed to the Step Four and, if necessary, Step Five of the sequential evaluation. *Id.* at *7. In determining the RFC, all the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities. *Id.* Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *Id.*

Here, the ALJ determined Ms. Sullivan has medically determinable impairments that are severe, including left foot fractures, osteoarthritis of the left foot and bilateral knees, hypothyroidism, and a hernia. (Tr. 20). The ALJ found Ms. Sullivan has other medically determinable impairments that are not severe, including a sebaceous cyst on the right side of the neck, chronic left shoulder pain, obesity, and anxiety. (Tr. 20-22). Though the medical records show Ms. Sullivan was diagnosed with CRPS and her counsel made the ALJ aware of the CRPS diagnosis at the outset of the hearing (*see* Tr. 43, 396, 671), the ALJ failed to assess whether the disorder constitutes a medically determinable impairment that is severe.

While the Commissioner is correct that the ALJ's decision does not require explicit reference to an SSR, the ALJ must still adhere to the directives of the SSA, including SSR 03-2p. *See Shepard v. Comm'r of Soc. Soc.*, 705 Fed. App'x 435, 439 (6th Cir. 2017). In this case, it is apparent the ALJ was not aware of the unique characteristics of RSDS/CRPS and did not weigh those characteristics in assessing the evidence. *See Darabed v. Astrue*, No. 1:10CV2626, 2011 WL

28

7456148, *8 (N.D. Ohio Dec. 6, 2011) (ALJ failed to follow SSR 03-2p because although he discussed Darabed's allegations of pain, he did not mention or discuss the claimant's claims of CRPS into consideration), *report and recommendation adopted,* 2012 WL 715863 (Mar. 5, 2012). Accordingly, for the reasons described below, I conclude that remand for re-evaluation in light of these principles is necessary.

**B.  The ALJ's evaluation of Dr. Jonathan Sharpe's medical opinion is not supported by substantial evidence.**

An ALJ's RFC assessment must be based on all relevant evidence in the case record, including statements from medical sources. SSR 96-8p, 1996 WL 374184, *5. Because Ms. Sullivan filed her applications after March 27, 2017, the medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2) and 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a) and 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.,* No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the

29

consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[2] and consistency.[3] 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3) and 416.920c(b)(2)-(3).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). While the new regulations may be less demanding than the former rules, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy*, 554 F. Supp. 3d at 908. Agency regulations "set forth a 'minimum level of articulation' to be provided in

---

[2] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[3] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

The ALJ's evaluation of Dr. Sharpe's medical opinions is as follows:

> I am not persuaded by the opinions of Jonathan Sharpe, D.P.M. On November 12, 2019, Dr. Sharpe opined that the claimant was unable to return to work in a week and may be facing long-term disability. On March 11, 2021, Dr. Sharpe opined that the claimant could stand/walk about 2 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, has serious chronic foot pain that severely limits her ability to function, and would be off-task at least 20% of the workday (due to pain) and/or absent 4 days per month. The medical evidence does not support such extreme and work-preclusive limitations. Medical imaging showed degenerative changes. Another physician who examined the claimant's foot stated that the medical imaging does not support the claimant's complaints of severe pain. Therefore, I am not persuaded by Dr. Sharpe's opinions.

(Tr. 28) (cleaned up). The other physician the ALJ refers to is Dr. Coxhead. (*See* Tr. 778). But Dr. Coxhead actually stated there was "unclear etiology of [Ms. Sullivan's] foot pain based on the MRI" and discussed that the pain may be related to overloading the lateral border of her foot after her knee replacement. (Tr. 778). The only reasonable interpretation of Dr. Coxhead's statement is that the MRI did not reveal the cause (*i.e.*, etiology) of Ms. Sullivan's foot pain; it cannot be read to say the MRI did not support the severity of her reported pain. Moreover, Dr. Sharpe himself previously noted that the etiology of Ms. Sullivan's pain was unclear and discussed other possible sources of pain, including "nerve-related." (Tr. 665-66). Thus, substantial evidence does not support the ALJ's stated reason for rejecting Dr. Sharpe's findings.

31

Moreover, SSA's guidance for evaluating cases involving RSDS/CRPS indicates that medical imaging is not the metric by which the condition should be evaluated. One of the hallmarks of RSDS/CRPS is that the pain is often out of proportion to the severity of the injury. As such, in this case, medical imaging showing only degenerative changes is not inconsistent with Dr. Sharpe's opinion that Ms. Sullivan's pain is severe enough to be entirely work-preclusive. The ALJ provided no other rationale for discounting Dr. Sharpe's opinion. Therefore, her conclusion that Dr. Sharpe's opinion is unpersuasive is not supported by substantial evidence. The ALJ's error in evaluating Dr. Sharpe's opinion is not harmless error and requires remand. The VE testified if an individual was limited to the restrictions opined by Dr. Sharpe, the individual would be unable to perform Ms. Sullivan's past relevant work. (Tr. 75).

**C.     The ALJ erred in her evaluation of Ms. Sullivan's statements about the intensity, persistence, and limiting effects of her pain**

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and

any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements:

1.  A claimant's daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.  Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.  Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ is not required to analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints to be inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p at *5. Similarly, the ALJ may not reject an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of

impairment-related symptoms alleged by the individual but must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); *see also* SSR 16-3p at *6.

The ALJ is required to explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ specifically discounted Ms. Sullivan's statements about the intensity, persistence, and limiting effects of her pain solely after concluding those statements were not consistent with the medical evidence, specifically the medical imaging (Tr. 25, 28). This runs

directly contrary to the dictates of the SSA's regulations that state adjudicators will not reject statements solely because the medical evidence does not substantiate an individual's statements. As noted above, because of the transitory nature of the medical indications, CRPS is difficult to verify through objective testing. *See* SSR 03-2p at *4. Thus, relying primarily on medical evidence to discount Ms. Sullivan's symptoms in this case runs contrary to SSR 03-2p and constitutes harmful error. *See Mills v. Comm'r of Soc. Sec.*, No. 1:15 CV 1190, 2017 WL 4083149, *6 (N.D. Ohio Jul. 27, 2017), *report and recommendation adopted*, 2017 WL 4077142 (N.D. Ohio Sept. 14, 2017).

The ALJ did not clearly articulate any other reason for discounting Ms. Sullivan's complaints of pain to multiple providers. Ms. Sullivan's complaints are remarkably consistent across the longitudinal record, including complaints of intense pain aggravated by walking and alleviated with rest. (Tr. 396, 466, 469, 667, 671, 674, 677, 683, 689, 691, 694, 696, 701, 703, 773, 777, 780, 794). In instances where an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical[4] and other record evidence, SSA guidance states, "we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities." SSR 16-3p at *8.

I recognize a re-evaluation of Ms. Sullivan's statements in a manner expressly consistent with SSA guidance may not necessarily result in a different conclusion. But SSA's guidance to its adjudicators mandates that an ALJ closely consider a claimant's statements about the level of pain,

---

[4]     The consideration of objective medical evidence in the record would be subject to the relevant guidance offered in SSR 03-2p, which as noted earlier cautions adjudicators that one characteristic of CRPS/RSDS is that the degree of reported pain is out of proportion to the severity of the injury. SSR 03-2p at *1.

especially in light of conditions in which the reported pain is typically out of proportion to the severity of the injury. *See* SSR 16-3p; SSR 03-2p. That was not done here. Having rejected Ms. Sullivan's statements solely because the medical imaging did not substantiate the severity of her pain, the ALJ did not evaluate those statements in accordance with the regulations. This requires remand for a proper re-evaluation.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits, disabled widow's benefits, and supplemental security income and **REMAND** for further proceedings consistent with this recommendation.

Dated: February 24, 2023


_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE


OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and**

Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).